May it please the Court, my name is Colin Walsh and I represent Rachel Escamilla in this appeal. The District Court's orders must be reversed in their entirety because at each step along the way, the Magistrate Court, the District Court, and appellees have mischaracterized Escamilla's pleadings, mischaracterized her allegations, and presented the facts in the Sheriff Elliott, which is the exact opposite of the proper summary judgment standard. Under established Fifth Circuit and Supreme Court precedent, this Court must reverse the dismissal of Escamilla's Section 1981 claim, the dismissal of her free speech claims, the dismissal of her equal protection malicious prosecution claim, and reverse the denial of the motion to amend. Because the case law and the facts are straightforward and clear-cut regarding Escamilla's 1981 claim and her motion to amend, I will address those two claims first briefly before moving on to the free speech and the equal protection malicious prosecution claim. The dismissal of Escamilla's Section 1981 claim must be reversed because it is based on a demonstrably false premise that Ms. Escamilla did not cite Section 1983 as the procedural vehicle through which her 1981 claim was brought. In fact, she did, on page two of her initial complaint in paragraph four, found on record page eight, she explicitly states that the trial court had federal question jurisdiction through 1983. Again, that's record page eight. She then incorporated that jurisdictional statement into each and every federal claim that she pled in her original complaint. And you can see that on record page 15 for the free speech claim, the 1981 claim, and on record page 17 for the equal protection malicious prosecution claim. To date, opposing counsel, neither the magistrate court, the district court, or opposing counsel have cited a single case stating that the explicit invocation of Section 1983 in the jurisdictional statement, and then the incorporation of that jurisdictional statement into the federal causes of action. Let me just ask you, I mean, it's there and I looked at it. I mean, below, did someone point that out to say, I mean, putting aside whether they thought it was enough, but I mean, the fact that it is there, did someone point it out? Yes, Your Honor. It was pointed out at each stage of this proceeding in our response to their initial motion for summary judgment, then in our objections to the magistrate report, and then again on appeal when the magistrate's report was adopted by the district court. So at each state, a step along the way, we did point out that on page eight of the record, or in paragraph four of our complaint, we cited Section 1983. And they have, nobody has said why that's not enough. None of the cases, and I've been unable to find a case saying that that's not enough. And it's not clear what else Ms. Escamilla needed to do in order to invoke Section 1983 as the procedural vehicle, besides what she did, which is cite it and then incorporate it. And that's why that should be reversed. Similarly, the motion to amend, the denial of her motion to amend her initial complaint should be reversed because under Fifth Circuit and Supreme Court precedent, motions to amend should be granted unless there is a judicial finding of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice to the nonmoving party, or futility. Here, the court did not make any of those findings. It did not find a single one of those factors was present. And you can see that on record page 695. Instead, what the court said was that the mere passage of time meant that she was going to deny the motion to amend. But this court has actually already rejected that argument without more as a basis for denying a motion to amend. In the DeSoy v. Gulf Coast Investment Corp case, this court held that mere passage of time does not preclude granting a motion to amend, but it is only undue delay that forecloses amendment. Because the district court did not find any of the factors necessary to deny a Rule 15 motion to amend, the denial of the motion to amend should be reversed. Now I'd like to discuss why the dismissal of Escamilla's free speech claims should be reversed. Well-established Fifth Circuit and Supreme Court precedent shows that public employees who go outside of their job duties or speak outside of work hours speak as citizens. And if they speak on matters of public concern, then they are entitled to the same constitutional protections as other members of the public. Here, Escamilla engaged in at least five instances of protected free speech where she spoke out as a citizen on matters of public concern. I'll go through each of those five instances and describe why she was speaking as a citizen for each and why they each concerned matters of public concern. The first two incidents occurred on June 4th and 5th, 2014. And this is where Ms. Escamilla, while on duty, called an off-duty co-worker who is like Escamilla, a jailer dispatcher, her name was Joanna Reyes, to talk to Joanna Reyes about unlawful behavior that she had seen at the Edwards County Jail that she was witnessing. And specifically what she talked to Ms. Reyes about was that Edwards County was unlawfully detaining an individual without a commitment order from a judge. This conversation occurred as a citizen because it was not part of Escamilla's job duties to report criminal behavior or corruption or malfeasance to off-duty co-workers and she was not responsible for getting commitment orders from judges for booking inmates into the jail. And this is acknowledged actually by the magistrate's report on record page 582, saying that these job duties appeared to be more within the jail administrator's sphere than within the jailer dispatcher's sphere, which was where Escamilla was. The conversation had no official function or purpose, which also weighs in favor of finding its citizen's speech. And that's because it's not clear that Reyes could have done anything. In fact, Reyes could not have done anything about that. She was at the exact same level as Escamilla, not within Escamilla's chain of command. She was off-duty. In other words, she was a civilian at the time that this conversation took place and she couldn't have done anything about the commitment order because, again, Reyes was not in charge of getting commitment orders from judges to ensure that that didn't happen. And again, both the magistrate and the district court agree that this was not part of Escamilla's duties and that it's not clear that Reyes could have done anything. The magistrate says that on record page 582, and the district court says that it's not clear Reyes could have done anything about that on record page 662. And so all of those factors weigh in favor of finding that this was citizen's speech because in Garcetti, it states that employees who make public statements outside the course of performing their official job duties retain some possibility of First Amendment protection because that is the kind of activity engaged in by citizens who do not work for the government. And then one of the explicit examples given in the Garcetti case is discussing politics with a co-worker. Here, Escamilla was discussing unlawful violations that she saw at the Edwards County Jail with a co-worker. And that leads me to the next part of this, which is how those June 4th and 5th conversations were matters of public concern. Under Anderson v. Valdez, this court has held that any evidence of corruption, impropriety, or other malfeasance on the part of officials in terms of content clearly concerns matters of public import. Here, Escamilla was talking to Joanna Reyes about an individual being unlawfully detained without a commitment order from a judge. According to Sheriff Elliott's own deposition testimony found on record page 447, that's a violation of law. Now, the district court and the magistrate court attempt to minimize this violation of law, saying it was a deficiency in clerical paperwork or had to do with mere substandard performance of job duties. But it's actually a lot more than that because it has to do with the unlawful deprivation of a person's Fifth Amendment constitutional right to liberty unless there's been due process of law. So it would be similar to saying that a warrantless search of a house was a deficiency in clerical paperwork or involved substandard performance of duties. That's true, but there are also constitutional violations and there are also matters of public concern. And for those reasons, the dismissal of those acts of free speech must be reversed. The second incident that I'm going to talk about occurred on July 31, 2014. And that's an even more clear-cut case of a public employee speaking out as a citizen on a matter of public concern. This instance involved an off-duty conversation between Escamilla and another off-duty co-worker, Tammy Whitworth, about Sheriff Elliott covering up the assault of one of her deputies. In other words, covering up a crime. This conversation occurred as a citizen because it is undisputed that the entire conversation occurred wholly while all participants in that conversation were off-duty. In fact, they were all working second jobs as EMTs. So they were not performing their official job duties. They were not working in furtherance of their official job duties. It was not done as part of their job as jailer dispatchers or jail administrators at Edwards County. And so that all factors, that all shows under Anderson v. Valdez and Garcetti that this is a citizen speech. It's a matter of public concern because the content of it had to do with Sheriff Elliott potentially covering up a crime or the assault of one of her deputies. And covering up a crime is itself a crime under the Texas Penal Code, Section 38.05. Is there any factor that identifies to whom, in other words, the recipient of the comment as a factor on whether it's public or private speech, protected speech? Because in the instances you've cited, I believe, relate to the plaintiff talking to another, a coworker, about matters in the office or at the jail. Does that make a difference at all whether, regardless of whether the coworker is on duty or not on duty or the plaintiff, for that matter? Is that a factor? So, Your Honor, what I would say is under Garcetti, that is not a dispositive factor. Under Garcetti, the Supreme Court explicitly says that conversations among coworkers while on duty discussing politics may be entitled to First Amendment protection. And here, we don't actually, this isn't even a difficult issue because she is talking to people who are off duty. This is a wholly off-duty conversation among off-duty coworkers. Imagine going to a happy hour and discussing this stuff with your coworkers. That's going to be obviously protected free speech. If members of the public were at a happy hour discussing corruption they saw at the Edwards County Sheriff's Department and the sheriff came in and arrested them, it would undeniably be a violation of their First Amendment rights. And so... I guess there's sort of, to me, and maybe I'm the only one that struggles with this, but some vagueness in terms of protected speech. There are obviously a variety of factors that go into it, aside from the content, but it seems I don't think Garcetti even mentions about, like you just said, whether it's a coworker, whether the coworker's on duty or not. Again, the content, whether it's about politics or it's about an internal office scandal or a potentially scandalous set of facts. In this case, we don't have an employee who is going to, let's say, a local investigative reporter for the local paper or who's reporting it to an inspector general or up the chain to some type of public integrity person. Here we have an employee talking to a coworker, again, whether on duty or off, either one of them, about things in the office. So I'm trying to draw the line on this one way or the other. Obviously you're arguing that it is First Amendment-protected speech made by the individual in her private capacity. So I guess I'm trying to get you to put a little more definition on it. Well, sure, and, Your Honor, what I would say is that that is actually exactly what makes it private citizen speech, talking to a coworker. If she had reported it up the chain, if she had gone to HR, it would, I think, be very clearly within this court's precedent that she was acting within her job duties, within the performance of her job duties. And the Supreme Court has repeatedly held going to HR and reporting misconduct that you see is not free speech. The courts are not constitutionalizing employee grievances. But having conversations with coworkers, and especially off-duty conversations with off-duty coworkers, is protected free speech, because that's what citizens do. Why don't you give me a step back from pre-Garcetta to Connick v. Myers, the case that came out of New Orleans, and that's District Attorney Eric Connick. You remember in that case that one of the young attorneys was concerned about being transferred to another job post, which she didn't like, and she was going to coworkers and getting them to sign petitions and raising questions, et cetera. But that activity with regard to her relationship with the others was not seen to involve an exercise of protected speech itself. Do you remember that decision? I do remember that decision, Your Honor, but I would say that that's distinguishable here because that was done on duty, and if I'm remembering the facts correctly, she went around with a questionnaire asking about various issues, and the Supreme Court found that only one question as to the questionnaires that she was circulating for people to sign about perhaps District Attorney Connick requiring that they participate in political campaigns or something of that sort. The Supreme Court said, well, that one may be a little troubling, but the rest of it, the circulation of it internally, the District Attorney Connick came back to his office and first assistant said that this young lawyer was making chaos out of the office and circulating these petitions to be signed, et cetera, and he fired her. Well, and I would say that there's other factors in that case. I'm sorry, Your Honor. I'm following on to my colleague's question but rather Garcetti later teaches us about speech that is part of the discharge of your duties. It's not protected speech, but antecedent of the development of that First Amendment jurisprudence is Connick v. Myers. Right, but I would say the same concerns in Connick v. Myers in Garcetti are not here, at least for the June 4th and the July 31st 2014 complaints because these did have to do with conversations with off-duty co-workers, and July 31st was entirely off-duty. It would essentially strip public employees of First Amendment protections if you said that they could not talk with their co-workers about corruption, malfeasance, or impropriety that they had witnessed without fear of being fired, and that is just simply not supported by Supreme Court precedent or this court's own precedent regarding whether or not they're speaking out as a citizen because it has to be done in performance of their job duties, which was the explicit purpose. Speaking of a matter of the public interest and not a matter of a private concern with internal affairs, the one issue that she was arguably speaking to, a public issue, had to do with the question of her assertion that the district attorney was requiring participation of young lawyers in the political sport. But otherwise, the internal discussion among the employees and so forth. Right, and so the Supreme Court said that they had some concerns about that particular issue. I would say that it would have been an easy case for the Supreme Court if that had happened outside. It establishes the basic question of what is public speech and private speech, and the threshold is whether you determine you're engaging in protected speech at all. I'm not trying to – I'm just trying to get back to the more basic question about protected speech. Well, in your honor, I think you're talking about the interplay between speech as a citizen and whether it's on a matter of public concern. And so I think that those issues, they can sometimes be hard to disentangle. Her petition was primarily quarreling with her transfer from one post in the district attorney's office to another. She thought that her transfer was to a lesser post, and she was protesting that particular decision. And that was not a matter of public concern. Now, she's doing a lot of talking and a lot of speech to coworkers and so on and so forth. But that was unprotected, and he could fire her for creating a difficulty. Now, when she also in this questionnaire that she was circulating raised the question of whether the district attorney was requiring them to participate in political campaigns, that got the court's attention. But that's the basic teaching, that coworkers talking about their jobs, complaining about their jobs in each and every way, in and of itself doesn't necessarily create a speech of a public character. And until you get there, you don't go further in the personnel analysis. But I take it you would urge that in this scenario, certainly as to July 14, number one, the conversation is purportedly about the sheriff covering up a crime, to which you would say that would be a matter of public concern, and you're adding to it the conversation is not occurring within the workplace, but it's occurring elsewhere. So, I mean, I take it your argument, at least as to July 14, the nature of the covering up a crime would be a matter of public concern, and it's occurring off-site, distinguishing from the Connick or other examples where it's about an internal employment. Would that be right? Yes, Your Honor, that's exactly correct. The July 31st conversation took place off-duty while they were not working for the Edwards County Jail and did have to do with covering up a crime, which are not the same as Connick, which took place while working during the day in an internment. Conversations about a crime, certainly Connick helps you because the one thing that the court flagged was the assertion that the public involved, and it involved the public interest, public speech, whatever, was the question of something of impropriety, assertively impropriety of the district attorney. And that's what you would follow in that narrow window, I think, if you're talking about complaining of a violation of law. Absolutely, Your Honor. I would agree that that aspect of Connick does definitely help our case because it has to do with now you have protected speech, but then the question is whether Garcetta takes it away. Well, and again, I would say it's not applicable because this did take place off-duty while they were not working for the jail. Unless the court was going to say that public employees are always public employees, regardless of whether it's during working hours or they're never off-duty from their public employee job, then they're acting smoothly. Let's put a pin in your point there. Let's hold it. Let's hear from the government. You've reserved your rebuttal time, and then there may be more to unpack even after that. Thank you, Your Honor. All right. Let's see where we are. All right. Let's hear from the state, I should say. I'm sorry. I said the government. I apologize. Thank you, Your Honor. May it please the court, counsel. My name is Charles Fruggerio, and I represent Edwards County and Sheriff Pamela Elliott in this case. This is a termination case. Rachel Escamilla was terminated for violating the policies of the Edwards County Sheriff's Department by conducting an unauthorized license check. Now that might seem—I'd like to just explain a little bit about that to you. In Texas, you have to be certified under the Texas Commission on Law Enforcement as a TLETS operator. And as a TLETS operator, she knew, and she acknowledges this in her deposition, that if you run a license plate check, it has to be requested by a law enforcement officer. It wasn't in this case. This was actually done by Ms. Whitworth. Much of this case is the interaction between Rachel Escamilla and Ms. Whitworth, who are coworkers. And when it was determined, going back and forth, Rachel Escamilla, most of these conversations, two of those of the five, she's complaining to Sheriff Edwards about Ms. Whitworth. And when it came out that there was a license plate check that was unauthorized, that's when the sheriff looked into it and said, well, let's take a look into it. You can look at it through the computer. Who would log in to see who actually did this license plate check that was unauthorized? And it came out to the login of Rachel Escamilla. And she admitted that, but then she has to try to explain it by saying, well, someone else must have used my login. But the bottom line is it was her login that did an unauthorized license check, which led to Escamilla's termination. That's what led to her termination. And none of the other instances where plaintiffs are trying to claim it was a First Amendment violation of free speech. Of these five incidences we're talking about, the first two, one about the booking statement and the office information statement, these are conversations between Ms. Escamilla and Joanna Reyes, who was her coworker, who's also a dispatcher, talking about office operations. That type of speech is not a speech of a citizen on a matter of public concern. And this court has had numerous cases, and I cited them in our brief. For instance, going back to Davis v. McKinney that involved an internal auditor's complaint with regard to one of the individuals having pornography on the website of the computers of the office. They held there was no constitutional violation because that conversation in the report, up the chain of command, was about something that was occurring in the office. Williams v. Dallas Independent School District is where a coach was complaining internally how the money was being spent in the school. That, again, he wasn't a citizen speaking on a matter of public concern because he was talking about the course and scope of his duties, and he was complaining about what he knew about the school district and how the money was being spent. But that was not a First Amendment violation. Gibson v. Kirkpatrick is an interesting case this court held in 2014 about a police chief who was fired by the mayor when the chief complained to the FBI that the mayor was using the gas card illegally. This court held that the chief was not speaking on a First Amendment basis. It was, of course, the scope of his job, what he was doing. He saw what he perceived to be a violation of law. He reported it, but it doesn't mean he has a First Amendment protection because he was fired on that termination. That was not speaking out as a citizen on a matter of public concern. This court also, and probably at most when we speak of a jury trial, most of these were summary judgment cases, but the other case I cited, Rodriguez v. City of Corpus Christi, was actually a case that went to a jury trial. It was a city administrator who was fired for allegedly writing an account of corruption within the city, and she was writing this complaint up the chain of command, and she was terminated for it. The trial court entered a judgment for the plaintiff, and the city appealed to this court. This court reversed the jury trial verdict for the plaintiff, holding that the individual was not speaking out as a citizen because she was speaking about the court's scope for duties as she saw it, as she saw the corruption allegedly in the city of Corpus Christi, but that was not a First Amendment speech protection with regard to that plaintiff, and the court reversed the jury verdict. Wilson v. Trege is another case involving a deputy chief of police. It was a 2015 case from this court where interrogation rooms were being 24-7 videotaped, and the chief deputy thought there was something wrong with having a room being 24-7 videotaped at the sheriff's department, so he reported to the district attorney. The district attorney asked for an opinion from the state attorney general, and it was determined there was no illegal activity. It was appropriate to film the interrogation room that way, but because the deputy chief had reported it, the deputy chief was fired by the sheriff, and this court held and affirmed the summary judgment that the chief deputy was not speaking as a citizen on a matter of public concern. That was part of his duties, and as part of his duties when he found out one of the rooms in his interrogation room was being filmed, he brought that to the attention of the district attorney, and because he was fired for that, it was not a violation of the First Amendment. One of the most recent cases is Malin v. Orleans Parish, where the plaintiff complained, again, of pornography that the HR director was allegedly perpetrating in the department, the school, and the complaints were made up to the supervisors, and the complainant was terminated. Again, the court held that those complaints were not made as a citizen. Those were made in the course and scope of your duties. You worked for the HR department. The HR director was doing these inappropriate acts, but that was speech forwarded in the course and scope of your employment, and therefore you didn't have a First Amendment protection. In this particular case, these five instances, other than the two that were directly made to the sheriff, the other three we would call them, in Texas, chisme, gossip. These were gossiping between employees. Ms. Escamilla was trying to get Tammy Whitworth in trouble, and in her gossiping, trying to get her in trouble eventually led to the investigation as to why there was this unauthorized license check, which led to her termination. That is the issue there. With regard to the Section 1981, there, Your Honor, was specifically pled first cause of action in 1981. Paragraphs down, Section 1983, second cause of action. It's very clear. And the case that we cited to you is a federal supplement case out of Montgomery Smith v. Louisiana Department of Health and Hospitals. It's exactly the same as this case. Are you arguing that the pleading was insufficient in terms of setting out the Section 1983 as derivative of the 1981? Yes, Your Honor. Why? I mean, you know, in light of the case the Supreme Court sent back to us, specifically reversed in the Fifth Circuit of saying, well, the plaintiff didn't, you know, set it out specifically. They reversed us summarily. And in this case, he says this court has original jurisdiction to hit his complaint under 28 U.S.C. Section 1331, jurisdiction being brought under 42 U.S.C. Section 1981 and Section 1983. So, I mean, it's referenced. So I just don't understand, in light of the fact that this court specifically held in Johnson v. Shelby that it was insufficient, and the Supreme Court summarily reversed us saying that our doctrine was wrong. Your Honor, I would respectfully mention that the Shelby case was a Section 1983 case that just wasn't pled under Section 1983. But the elements were there. But the point of it was saying to the Fifth Circuit, you know, if somebody doesn't lay it all out or whatever, whatever, you know, that the claim was insufficiently pled. And I'm simply saying I get it if it's not mentioned or whatever. But in this instance, I mean, looking at it, it specifically references Section 1983. I mean, it just seemed to me a pretty hyper-technical view of the pleading where it's, in fact, there, as opposed to having it be read somewhere. And I just don't understand how that can be reconciled with Johnson v. Shelby. Well, I think because he specifically pled it as one cause of action, Section 1981, and then the second cause of action, Section 1983, that's one argument. I guess my main argument is that you can't plead Section 1981 with regard to a governmental entity under Jett, the Supreme Court case, number one. And number two, you can't plead a Section 1981 case against an individual governmental employee either. And that's under the case of Odin v. Octopeda County, Mississippi, that this Court held in 2001. Well, I got Odin up here, and I read it. I still don't understand how. I mean, you're talking about pleading. You know, it's notice pleading, and we've had all of that, and it just seems it's notice pleading. I mean, I don't really get it where it's mentioned in there how, since it's a different question of whether or not you can make the cause of action out and, you know, prove it and all of that, but just on bare pleading, I don't get it. The common jurisdictional statement of the complaint, in my experience, is that this Court has jurisdiction under 28 U.S.C. 1331, the 42 United States Codes, and that's in 1983, and frequently that's right in 1981. And that's a common allegation that the Court's jurisdiction, and then they go forward. If you read this pleading together, they tend to separate them. That's essentially what the complaint does. Is that true or not? Your Honor, the reason Section 1981 is even pled is because he's trying to circumvent Title VII, which is another argument that you can't do. He's trying to circumvent it because the time frames had expired. And Irby in this Court, Irby v. Sullivan, said you can't circumvent Title VII by trying to plead it around. Of course. You have a whole series of cases in which the Supreme Court has said that 1983 is not available where the Congress in a separate federal statute has particularized a particular form, a particular remedial response to it, and that explains Title VII. The rejection here was that the plaintiff had filed a freestanding 1981 claim, not mentioning 1983. That's the point. Not whether, you know, it can prevail or, as you say, it's to get around Title VII. The way I read it, it was, you know, sort of back to, okay, you don't – you allege a freestanding 1981 without missing 1983, blah, blah, blah. That's the way I read the rejection, and I looked at the reference to it, just kind of don't understand that rationale. That's not to say there might be some other basis upon which it doesn't get to first base, but just on the no reference, when I'm looking at it here, I don't get it. That's why I asked him when he was up here, well, did somebody reference or point out to the Court that there it is, 1983? I mean, to which, as I said, there might be another reason for it to go out. It just seemed to me swimming upstream when the Supreme Court, nine to nothing, kicks it back and says wrong, you know, to say that where it's not mentioned here, you're struck out. That's the part that – Yes, Your Honor. But in our motion for summary judgment and throughout our process, our argument was that Section 1981 didn't state a cause of action under these facts because you're trying to circumvent Title VII. The complaint alleged original jurisdiction under 28 U.S.C. 1331. They brought under 42 United States Code Section 1981 and 1983 and, of course, supplemental jurisdiction 1367. All the jurisdictional allegations are there. Then you go forward, and all you need to do is make a short form of your claim. You don't have to – we don't have to particularize pleading here. I don't think Iqbal plays a role in this. So that's why we – my concern is that I understand your argument, but when I look at what the allegation here, that's a very common allegation, and the court plainly had jurisdiction under these allegations. I mean, that is alleged jurisdiction, I should say. In our summary judgment, our motion was based on the fact that with these facts— If they don't have a claim under 1981, then your response to that is that they don't – 1981 doesn't give them any relief. Yes, Your Honor. But not that it's not before the court. But the summary judgment – the court's granting of our summary judgment is before the court, and his intentional circumvention of Title VII, there's no equal protection claim here. She was fired because she violated policy, plain and simple, and there's really no other reason why she was fired. And by going into these other – for instance, these First Amendment issues, they're simply gossip among coworkers, and of those three of the five, there's no even evidence that the sheriff even knew about the gossiping going on. And it's not like she overheard him saying this. So the motivating factor has to come into play also under the First Amendment, and there's no reason that the sheriff would be motivated if she didn't even know about it. So the only two, then, that we're looking at is the direct communication she had directly with the sheriff, and that wasn't the reason. It was, I think, by the sheriff's own testimony is obviously the reason why she was terminated was because she violated policy. And with regard to – the other aspect is the malicious prosecution claim. This was – The complaint in Newman put four causes of action – put aside causes of action for a moment – four claims, and it starts, one, with the denial of equal rights and benefits because of a race, First Amendment violations, Texas constitutional violations. The straightforward – they have jurisdiction under 1983, I'm sure, right? Didn't the court have jurisdiction under 1983? Yes, Your Honor, and they granted our summary judgment because of the facts. Okay. Well, what claims – a claim of equal protection, denial of equal protection of the 14th Amendment is certainly enforceable by 1983. Yes, but there's no evidence that termination was that. I understand, but I'm talking about pleading defects. I don't see that – it's not clear to me, looking at this, whether the presence or absence of 1981 matters in this case, or does it? I don't think it matters, Your Honor. Quite frankly, because under Section 1983, the summary judgment was still granted. There was no violation. Under whether we call it due process, equal protection, First Amendment, there's no violation of the Constitution. And as to the malicious prosecution claim, the sheriff simply gave the information, the investigation to the district attorney. The district attorney came up with a no bill, and the trial court said, well, that's the purpose of a grand jury. The evidence was presented. There was a no bill issue, but that's not malicious prosecution. There's no evidence that the sheriff did anything ill motive with regard to the fact that the investigation. Your Honor, I've spoken to the malicious prosecution also itself. In Castellano and Cuadro? Yes. So, Your Honor, we would ask on behalf of Sheriff Elliott, who also is claiming qualified immunity, which the court granted, but there is no constitutional deprivation. We would ask the court to affirm the summary judgment. Thank you. All right. Thank you, sir. All right. Thank you, Mr. Walsh. You're reserved four minutes. Thank you, Your Honors. Just a few points. So I want to go all of the cases that the opposing counsel cited regarding the free speech issue and the division between acting as a citizen or speaking as a public employee are highly fact specific, and the level of abstraction, I think, does not help clarify that. So in Williams, but what I can quote to you guys is the Fifth Circuit's formulation of the test for whether or not somebody is speaking as a citizen or as part of their public duties, and this comes from Anderson v. Valdez. And this is 845F3580, page 596. Whether the employer was entitled to control the employee's speech determines whether that speech was made pursuant to the employee's official duties. So here the question is, was Sheriff Elliott entitled to control Escamilla's speech when she was working a second job as an EMT having an off-duty conversation with a coworker? Or was Sheriff Elliott entitled to control Escamilla's speech when she had made a phone call to an off-duty coworker, Joanna Reyes, to report what she believed to be violations of her duties? Are you trying to apply a Garcetti standard? I'm sorry, Your Honor? Are you arguing Garcetti or not? Well, yeah. The Garcetti standard has to do with whether it's in performance of their job duties. I'm going to go repeat myself again. The Supreme Court made a determined effort in the Connick v. Myers to keep itself out of workplace disputes. And, you know, you can have all kind of banter among employees, whatever they are, unless they fall into the dance out of that into a matter of public interest, they're not going there. The back and forth between employees, et cetera, et cetera, are not covered. Garcetti is a lighter case and fills in gaps. And it says that where the employee is speaking and carrying out his duties in the course of that, there is no First Amendment protection for that. I agree, Your Honor. And what I would say is the speech at issue in this case, the content of it, does not have to do with inner office squabbles or procedural mechanisms. Calling it clerical paperwork ignores the fact that when she spoke on June 4th and 5th, she was talking about deprivation of a constitutional right. Or on July 31st, she was talking about covering up a crime, which is itself potentially a penal code violation. These are different than the internal office politics or transfer requests or squabbles that the court doesn't want to get involved in. What's your response, you know, to the briefing and the major response that the termination was directly related to the unauthorized license check or whatever, whatever, and that, you know, these other claims are just sort of there? My response would be that that particular issue is not before this court because that's not what summary judgment was granted on. That's not what this case is about. If you look at their motion for summary judgment, if you look at the court's order, the magistrate's report and recommendation, the 1981 claim has not been – they have not challenged the merits of it. They challenged the pleading sufficiency and whether or not it was a freestanding claim or properly brought under 1983. Regarding the free speech claims, they have not – the court decided that it was not done as a citizen on a matter of public concern, and so that's the issue we've addressed. So we haven't actually gotten to whether there was a causal link or causation element to it, and they didn't really argue that. I could argue that. We did argue it in our initial response to their motion for summary judgment, but it wasn't brought up on appeal as far as I could tell in their response, and it wasn't brought up by the district court or the magistrate because they looked at these threshold issues and kicked the case out. Regarding the malicious prosecution claim as well, again, that was not brought based on the merits of that claim but simply a pleading sufficiency and whether or not Escamilla has sufficiently pled such a claim. My final thing that I would say is if this court reversed the denial of the motion to amend, both the 1981 claim and potentially the equal protection malicious prosecution class of one claim, pleading deficiencies would be fixed because the court never actually looked at the amended complaint to say whether or not we would have defeated these alleged deficiencies, and we don't think that there were any, but to the extent that there even potentially were deficiencies, simply allowing us to amend the complaint would be a way for us to fix that. The motion to amend, I mean, what is it, 19 months? I mean it's a long time, and our standard view for that is abuse of discretion. So where was the abuse of discretion given timing and so forth? I don't mean there was a statute of limitations, but there was quite a ways. Your Honor, I agree. It was a long time, but this court has explicitly said— Abuse of discretion. That's the standard review we have on a motion to amend. I'm just asking you. Now what we said in the case, tell me how it was an abuse of discretion. The abuse of discretion was that this court has held it is an abuse of discretion to deny a motion to amend unless there is a finding of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice, and futility. And this is from the Smith v. EMC Corporation case. How long was this one? What was the period of time here? In this particular case? I believe Your Honor was right that it was 19 months, almost two years, or maybe even over two years. Why wouldn't that be undue delay? The court did not find that it was an undue delay. And in fact, the rules contemplate making an amendment to the complaint even after judgment is entered. In fact, in the Smith v. E—I'm sorry, in the DeSoy v. Gulf Coast investment case, this court held that it was an abuse of discretion to deny a motion to amend made 41 days after the court had dismissed the plaintiff's cause of action. And in that sense, what they said was mere passage of time does not preclude— I get that. All I asked you was a simple question. In this case, it was 19 months, give or take, before the motion to amend. Undue delay is a factor. I'm just asking you, what was the abuse of discretion that we would have to find for the court to deny a motion to amend when 19 months had elapsed? The answer to that is the court did not find there was an undue delay. The court simply said that the mere passage of time was the reason that it should be denied. There was no undue delay. Delay is not enough. It has to be an undue delay, and there has to be a finding of that. And the district court did not make that finding in its denial of our motion. And that's an abuse of discretion. You're telling me what the court didn't find, but you're still not telling me why we, a panel, would say that the denial was an abuse of discretion based on what's presented to us. Because this court has held that the mere passage of time is not a valid reason in and of itself to deny a motion to amend, and it's only undue delay if it is found by the district court. Here the district court abused its discretion in denying a motion to amend without finding any undue delay. Under this court and Supreme Court precedent in Foman v. Davis, and this court's precedent in Smith v. EMC Corporation. All right, I got you. I just want to make sure you addressed all the issues that were briefed to us. Thank you, sir, for your argument. Thank you. Also, this completes the cases set for argument for this panel.